Dale J. Lambert, #1871
    Dale.Lambert@chrisjen.com
Sarah Elizabeth Spencer, #11141
    Sarah.Spencer@chrisjen.com
CHRISTENSEN & JENSEN, P.C.
15 West South Temple, Suite 800
Salt Lake City, Utah  84101
Telephone:  (801) 323-5000
Facsimile:  (801) 355-3472
*Attorneys for Plaintiffs Christopher Maggiore
and Robert McLain*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF UTAH, NORTHERN DIVISION

| | |
|---|---|
| CHRISTOPHER MAGGIORE, an individual, and ROBERT MCLAIN, an individual,<br><br>　　　　Plaintiffs,<br><br>vs.<br><br>BRADLEY C. ROBINSON, an individual, and CEPTAZYME, LLC, a Utah limited liability corporation,<br><br>　　　　Defendants. | **COMPLAINT**<br><br>and<br><br>**JURY DEMAND**<br><br>Case No. 1:13-cv-00076-PMW<br><br>Magistrate Judge Paul M. Warner |

Plaintiffs Christopher Maggiore and Robert McLain, by and through undersigned counsel, hereby allege the following against Defendants Bradley C. Robinson and Ceptazyme, LLC, as follows:

### PARTIES AND JURISDICTION

1.　　　Plaintiff Christopher Maggiore is a resident of Canton, State of Ohio.

2.　　　Plaintiff Robert McLain is a resident of Canton, State of Ohio.

3.　　　Defendant Bradley C. Robinson ("Robinson") is an individual and a resident of Davis County, State of Utah.

4.　　　Defendant Ceptazyme, LLC ("Ceptazyme") is a Utah limited liability corporation.

*NATURE OF THE ACTION*

5.     This is a securities fraud lawsuit.   Between mid-September and November of 2010, Defendants made intentional misrepresentations of material fact in connection with their sale of securities to Plaintiffs.   Plaintiffs relied on Defendants' fraudulent misrepresentations. Defendants' fraudulent misrepresentations of material fact induced Plaintiffs' investment of $160,000 and caused Plaintiffs to suffer economic losses in an amount to be proven at trial.

6.     Plaintiffs bring this action pursuant to Section 27 of the Securities Exchange Act of 1934 (hereinafter, "1934 Act") (15 U.S.C. § 78aa), and other state and common law sources of law.   Plaintiffs seek damages and costs of suit, including reasonable attorney fees, as the result of Defendants' violations of: a) Section 10(b) of the 1934 Act (15 U.S.C. § 78j) and Rule 10b-5 (17 C.F.R. § 240.10b-5) as promulgated thereunder; and, b) Section 20(a) of the 1934 Act (15 U.S.C. § 78t(a)), amongst the other violations of the law set forth herein.

7.     Subject matter jurisdiction is proper in this Court pursuant to 28 U.S.C. § 1331 because this action involves a federal question affecting interstate commerce arising under Section 10(b) of the 1934 Act, and pendent state law claims arising out of a common nucleus of operative fact.

*FACTUAL ALLEGATIONS*

8.     Plaintiffs re-allege and incorporate by reference the allegations set forth in the preceding paragraphs of this Complaint.

9.     Plaintiffs are shareholders of non-party entity called Health Enhancement Products, Inc. ("HEPI"), a publically traded Nevada corporation headquartered in the State of Michigan.

10.     HEPI is the rightful owner of certain intellectual property and know-how relating to nutritional products known and trademarked as "ProAlgaZyme" (hereinafter, "the PAZ Product").

11.     During the spring and summer of 2010, Defendant Bradley C. Robinson engaged in discussions with HEPI on behalf of non-party Zus Health ("Zus Health") to enter into a worldwide exclusive license agreement with HEPI, wherein Zus Health would market, distribute and sell the PAZ Product.

12.     When Defendant Robinson initially approached HEPI regarding the negotiation of a potential agreement, he was purporting to act as a representative of Zus Health.

13.     Zus Health and HEPI entered into a written License Agreement on September 2, 2010 (hereinafter, "License Agreement").   The License Agreement granted Zus Health "an exclusive, world-wide license to market, sell and distribute the [PAZ] Product during the Term of this Agreement solely for the Licensed Use within the Territory."

14.     Defendant Robinson negotiated and signed the License Agreement on behalf of Zus Health.

15.     Under Paragraph 3.1 of the License Agreement, Zus Health was required to "deposit into a client trust account the sum of $225,000 as an Option Payment, with instructions that such funds are released to HEPI provided terms and conditions contained herein are met. Zus will have 30 days after the Effective Date to conduct such due diligence as it shall deem necessary regarding its rights and obligations under this Agreement.   During said 30-day due diligence period, HEPI agrees not to pursue discussions with any other party for the marketing and licensing of the Product.   Upon satisfactory completion of due diligence by Zus and on or before 5:00 pm., Pacific Daylight Saving Time, on the 31-day after the Effective Date, Zus

agrees to release from the client trust account to HEPI the sum of $255,000 as a non-refundable option to bind HEPI to an exclusive license for WW marketing for a period of four (4) calendar months beginning on the Effective Date."  This provision is herein referred to the "Option Payment Provision."

16.      Under Paragraph 3.2 of the License Agreement, Zus Health was required to make minimum monthly purchases of PAZ Product from HEPI under the order schedule specified therein.

17.      After Zus Health and HEPI executed the License Agreement on September 2, 2010, on or about September 16, 2010, Defendant Robinson approached Plaintiffs to solicit their investment in a new entity he was forming, Defendant Ceptazyme, LLC.

18.      Defendant Robinson called Plaintiffs on the telephone on or about September 15, 2010.  At that time, Defendant Robinson knew that Plaintiffs were already aware of the existence of the License Agreement between HEPI and Zus Health, because of the fact that Plaintiffs are shareholders of HEPI who learned of the negotiation and execution of the License Agreement as a result of their shareholder status with HEPI.

19.      Mr. Robinson told Plaintiffs that he was being forced to assign the License Agreement from Zus Health to a newly formed entity called Ceptazyme, LLC ("Ceptazyme"). Defendant Robinson explained that Zus Health was dissolving and ceasing business operations because of a sexual harassment claim that an employee had made against it.  Additionally, Defendant Robinson told Plaintiffs that he did not want other members of Zus Health involved in the HEPI License Agreement.

20.      Defendant Robinson also told Plaintiffs that he was in the process of drafting an assignment agreement wherein Zus Health would assign its rights and obligations under the

License Agreement with HEPI to the new entity he was forming, Defendant Ceptazyme. Defendant Robinson represented that he was forming Ceptazyme, LLC for the sole purpose of performing the License Agreement.

21.     Defendant Bradley C. Robinson filed articles of organization of Defendant Ceptazyme with the State of Utah Division of Corporations on September 22, 2010.

22.     Defendant Robinson knew that, at the time he contacted Plaintiffs on or about September 15, 2010, Plaintiffs were shareholders of HEPI and therefore that they had a vested interest in the success of the License Agreement.

23.     During a series of telephone calls with Plaintiffs in late September of 2010, after previously advising Plaintiffs that he had formed Defendant Ceptazyme, Defendant Robinson advised Plaintiffs on the telephone that he was experiencing difficulty capitalizing Defendant Ceptazyme.

24.     Defendant Robinson said to Plaintiffs during several telephone discussions held in late September of 2010 that he intended to assign the License Agreement to Defendant Ceptazyme, but that Defendant Ceptazyme did not possess sufficient funding to satisfy the Option Payment Provision of the License Agreement.

25.     Defendant Robinson also told Plaintiffs that, if Defendant Ceptazyme could not generate sufficient capital to satisfy the $255,000 Option Payment Provision of the License Agreement, the License Agreement would fall through and would not be performed by either Zus Health or Defendant Ceptazyme.

26.     At the time Defendant Robinson told Plaintiffs that Defendant Ceptazyme lacked sufficient funds to satisfy the Option Payment Provision of the License Agreement, Defendant Robinson knew that Plaintiffs, as shareholders of HEPI, had a vested interest in ensuring that the

License Agreement did not terminate and that HEPI's PAZ Product would be marketed, distributed and sold in accordance with the intent of the License Agreement.

*Misrepresentations of Fact*

27.     In early October of 2010, in a series of multiple phone calls with Plaintiffs, Defendant Robinson offered Plaintiffs the opportunity to purchase membership interests in Defendant Ceptazyme.  Defendant Robinson told Plaintiffs that their investment would provide the capital necessary for Ceptazyme to perform the License Agreement.

28.     In connection with the offer of investment, and during the series of multiple phone calls with Plaintiffs in October of 2010, Defendants made numerous intentional misrepresentations of material fact in relation their offering the purchase of membership interests in Defendant Ceptazyme to Plaintiffs.

29.     Defendants made the following material misrepresentations of fact at the time they solicited Plaintiffs' investment in Ceptazyme, LLC, amongst other misrepresentations:

   a.   Defendants misrepresented that they had an existing relationship with the owner and high-level executives of a Utah multi-level marketing company called Monavie.  Defendants misrepresented that within a period of three months following the assignment of the License Agreement, Defendant Ceptazyme would formalize a relationship wherein Defendant Ceptazyme would distribute the PAZ Product through Monavie's extensive multi-level marketing network.

   b.   Defendants misrepresented that they had an existing relationship with the owner and high-level executives of a Utah multi-level marketing company Xango. Defendants misrepresented that within a period of three months following the assignment of the License Agreement, Defendant Ceptazyme would formalize a

relationship wherein Defendant Ceptazyme would distribute the PAZ Product through Xango's extensive multi-level marketing network.

c.  Defendants misrepresented that within a period of three months following the assignment of the License Agreement, Defendant Ceptazyme would be distributing PAZ Product in "every nursing home in Utah," based upon Defendants' relationship with Steve Warren, M.D., a Utah geriatric doctor who Defendants misrepresented as the "largest nursing home doctor in Utah."

d.  Defendants misrepresented that they had an existing relationship with a business partner of William Gates of the Microsoft Corporation, which individual allegedly worked at the Gates Foundation.   According to Defendant Robinson, his connection at the Gates Foundation owned a film company called RedJet Films. Defendants misrepresented that within a period of six months following the assignment of the License Agreement, their connection, through his relationship with the Gates Foundation or RedJet films, would pay for and commence a controlled scientific research study to evaluate the use of the PAZ Product in patients with HIV-positive status.   Defendants misrepresented that significant amounts of funding for PAZ Product in HIV patients would come through the Gates Foundation.   Defendants misrepresented that the funding for research would enable HEPI to vastly expand its production capabilities and scientifically establish the health benefits of the PAZ Product.   Defendants misrepresented that the scientific research and funding would profoundly increase Defendant Ceptazyme's sales and profits, as the sole exclusive licensee of the PAZ Product.

e. Defendants misrepresented that they had existing relationships with high-level executives at Walgreens. Defendants told Plaintiffs that within a period of three to six months following the assignment of the License Agreement, Defendant Ceptazyme would be selling the PAZ Product at every Walgreens in the western United States.

f. Defendants misrepresented that they had existing relationships with the producer of the Dr. Oz television show, and that within a period of six months following the assignment of the License Agreement, they would secure a television appearance on the Dr. Oz show to advertise, promote and market the PAZ Product.

g. Defendants misrepresented projections of profits, sales forecasts and Defendant Ceptazyme's anticipated ability to procure customers and orders of the PAZ Product. Defendants falsely stated that within a period of three months following the assignment of the License Agreement, Ceptazyme would substantially exceed the minimum monthly orders of PAZ Product required under the License Agreement. Based upon such misrepresentations, Defendants guaranteed to Plaintiffs that Defendant Ceptazyme's profits would be voluminous. Further, Defendants misrepresented that based upon their existing business connections and relationships, Defendant Ceptazyme would double in six months and then triple in a year's time the minimum monthly orders of PAZ Product that Defendant Ceptazyme was required to order from HEPI under the License Agreement. Defendants misrepresented that after a period of six months Plaintiffs would receive a complete return on their $160,000 investment and would start

receiving their share of membership distributions from Defendant Ceptazyme, LLC due to the significant volume of sales of PAZ Product that Defendants claimed to be able to generate.

*Defendants' Scienter*

30.     Each of Defendants' material misrepresentations as set forth in Paragraph 29, above, were made with scienter, a mental state embracing intent to deceive, manipulate, or defraud, or at the least, Defendants made their misrepresentations with recklessness as to the truth of the statements.

31.     Defendants knew their representations regarding Monavie were false because Defendants knew they had no relationship with anyone at Monavie, that they could not procure even initial meetings with Monavie, let alone a distributorship relationship, and that no PAZ Product would ever be marketed, sold or distributed through Monavie.

32.     Defendants knew their representations regarding Xango were false because Defendants knew they had no relationship with anyone at Xango, that they could not procure even initial meetings with Xango, let alone a distributorship relationship, and that no PAZ Product would ever be marketed, sold or distributed through Xango.

33.     Defendants knew their misrepresentations regarding marketing, sale and distribution of the PAZ Product in Utah nursing homes were false because Defendants knew that the nursing homes with which Dr. Warren had relationships had institutional requirements, policies and rules regarding the use of nutraceutical products in their facilities, that nutraceutical products are usually not used in geriatric facilities, and that no PAZ Product would ever be marketed, sold or distributed through Utah nursing homes.

34.     Defendants knew their misrepresentations regarding PAZ Product research funding from the Gates Foundation and RedJet Films were false because Defendants knew they had no relationship with anyone at the Gates Foundation or RedJeft films, that they could not procure even initial meetings with either organization, let alone comprehensive funding for scientific research regarding the utilization of the PAZ Product in HIV-positive populations, and that no funding for research of the efficacy of the PAZ Product would ever be obtained from the Gates Foundation or RedJet Films.

35.     Defendants knew their misrepresentations regarding Walgreens were false because Defendants knew they had no relationship with anyone at Walgreens, that they could not procure even initial meetings with Walgreens, let alone a distributorship relationship, and that no PAZ Product would ever be sold at Walgreens' retail stores.

36.     Defendants knew their misrepresentations regarding the Dr. Oz television show were false because Defendants knew they had no relationship with the producers of or anyone else at the Dr. Oz show, that they could not procure even initial meetings with producers, let alone a distributorship relationship, and that no PAZ Product would ever be marketed or advertised on the Dr. Oz Show.

37.     Defendants knew their misrepresentations regarding doubling and tripling minimum orders and generating substantial profits were false, because Defendants knew they had no relationships with any actual or potential distributors of the PAZ Product, that given the lack of such relationships they would not be able to meet the minimum order requirements, let alone exceed those requirements by two- or three-fold, and that no PAZ Product would ever be sold in the represented volume, such that Defendants knew that Ceptazyme would not be profitable and that Plaintiffs would never receive a return on their investment.

10

*Materiality of Misrepresentations*

38.     Each of Defendants' misrepresentations as set forth in Paragraph 29 above were material because, had a reasonable investor known the truth, the truth would have "significantly altered the 'total mix' of information made available."  In other words, had Defendants disclosed the truth, a reasonable investor would have considered the disclosure important in deciding whether to invest and buy a membership interest in Defendant Ceptazyme, LLC.

39.     Each of Defendants' misrepresentations as set forth in Paragraph 29, above, were material because the tone and specificity of each of Plaintiffs' misrepresentations was certain and definite.

40.     Each of Defendants' misrepresentations as set forth in Paragraph 29, above, were material because the misrepresentations carried very significant relative importance to Defendants' business and the activity underlying the statements.  The misrepresentations related to Defendants' ability to procure distribution and sales relationships, funding for research, customers for the PAZ Product and profits for Defendant Ceptazyme as the sole exclusive licensee of PAZ Product.  Defendants knew that without such relationships with potential distributors of PAZ Product, Defendant Ceptazyme's business and the License Agreement would not succeed, that Defendant Ceptazyme would not be profitable, and that Plaintiffs' investment would be lost.

*Misrepresentations in Connection with the Purchase or Sale of a Security*

41.     Each of Defendants' material misrepresentations as set forth in Paragraph 29, above, were made "in connection with the purchase or sale of a security," because Defendants made the misrepresentations to induce Plaintiffs to purchase membership interests in Defendant Ceptazyme, LLC.

42.     Defendants never provided any disclaimers, warnings or cautionary disclosures to Plaintiffs of any risks associated with the investment.

*Plaintiffs' Rely on Misrepresentations to Acquire Membership Interests*

43.     Ultimately, based upon Defendants' intentional, material misrepresentations, Plaintiffs acquired membership interests in Ceptazyme, LLC.

44.     Plaintiffs McLain invested $100,000 and Plaintiff Maggiore invested $60,000 to acquire membership interests in Defendant Ceptazyme, LLC in early November 2010.

*Defendant Robinson Arranges for Zus Health to Assign*
*License Agreement to Defendant Ceptazyme*

45.     Defendant Robinson executed an Assignment Agreement on November 8, 2010, assigning all of Zus Health's obligations under the License Agreement to Defendant Ceptazyme.

*Defendants Fail to Perform as Represented and Never Procure the*
*Distribution Relationships or Sales of PAZ Product*

46.     Despite Defendants' representations regarding the distribution relationships with multi-level marketing companies that would give rise to sales and distribution of the PAZ Product, the retail sales opportunities, the represented avenues for marketing the PAZ Product, and the voluminous profits the venture would allegedly generate, Defendant Ceptazyme breached the License Agreement with HEPI and failed to perform thereunder.

47.     Defendants never formed any relationships with Monavie, Xango, the Gates Foundation, RedJet Films, or Walgreens.  The PAZ Product was never distributed, marketed, promoted or sold through such entities.

48.     Defendant Ceptazyme never satisfied the minimum purchases under the License Agreement.

49.     Defendant Ceptazyme never turned a profit and Plaintiffs never realized any return on their $160,000 investment in Defendant Ceptazyme, LLC.

50.     Upon information and belief, Defendant Ceptazyme, LLC is now a defunct business with no ongoing operations.

### FIRST CLAIM FOR RELIEF
Federal Securities Violations
Section 10(b) of the 1934 Act and Rule 10b-5
*All Defendants*

51.     Plaintiffs re-allege and incorporate by reference the allegations set forth in the preceding paragraphs of this Complaint.

52.     The investment described in the Complaint in detail above constitutes a "security," as that term is defined in Section 3(a)(10) of the Exchange Act, 15 U.S.C. §78c(a)(10).

53.     Specifically, among other things, said investment was to raise money for Defendant Ceptazyme's performance of the assigned License Agreement with HEPI.  Plaintiffs were interested in Ceptazyme's successful performance of the License Agreement because of the profits Defendants represented their investment with Defendant Ceptazyme would generate.

54.     Said investment was pooled into a common enterprise, as Defendants represented to Plaintiffs that Defendants were soliciting funds from other investors.

55.     Defendants used instruments of interstate commerce and/or the mails in connection with the misstatement and/or omission of material facts in connection with the purchase or sale of securities, specifically, said investment.

56.     Specifically, in order to persuade Plaintiffs to make the investment, Defendants made intentional or reckless material misrepresentations of fact.

57.     Defendants knowingly, or with reckless disregard, and prior to Plaintiffs investment with Defendants, directly or indirectly made untrue statements of material facts and/or omitted to state material facts necessary in order to make the statements not misleading in the light of the circumstances under which they were made.

58.     Defendants' material misrepresentations were in connection with the purchase and sale of a security because Defendants made their material misrepresentations to induce Plaintiffs' purchasing securities, namely membership interests in Defendant Ceptazyme.

59.     Defendants acted with scienter in making their material misrepresentations, as evidenced by the fact that Defendants used specific and detailed representations regarding the nature of business relationship and profits they would generate, which demonstrate that Defendants put significant thought into the lies before telling them to Plaintiffs.

60.     Plaintiffs relied on Defendants' fraudulent statements by going forward with the investment, and in fact investing $160,000.

61.     Plaintiffs, as reasonable investors, relied on said misrepresentations and/or omissions when investing in said investment and considered said misrepresentations or omitted facts to be important in making their investment decision.

62.     Defendants' misstatements or omission of material fact were the proximate cause of the loss of Plaintiffs' invested funds.

63.     Plaintiffs suffered actual damages in the amount of at least $160,000 as a consequence of Defendants' misrepresentations or omission of material fact, the exact amount to be determined by the Court.

64.     Plaintiffs are entitled to recover damages from Defendants, jointly and severally, in an amount to be proved at trial, but which shall not be less than $160,000.

***SECOND CLAIM FOR RELIEF***
Federal Securities Violations
Section 20(a) of the Exchange Act
*All Defendants*

65.     Plaintiffs re-allege and incorporate by reference the allegations set forth in the preceding paragraphs of this Complaint.

66.     Defendant Robinson acted as a controlling person of Defendant Ceptazyme, within the meaning of § 20(a) of the Exchange Act.

67.     Defendant Robinson was a principal of Defendant Ceptazyme, managed Defendant Ceptazyme, was an officer of Defendant Ceptazyme, controlled the actions of Defendant Ceptazyme, including the representations and misrepresentations of Defendant Ceptazyme, and determined what would be done with the investor funds surrendered to the care of Defendant Ceptazyme.

68.     By reason of his position with Defendant Ceptazyme, Defendant Robinson had authority to cause Defendant Ceptazyme to engage in the wrongful conduct complained of herein, which constitute violations of applicable securities laws and the rules promulgated thereunder.

69.     By reason of such conduct, Defendant Robinson is liable pursuant to § 20(a) of the Exchange Act.

70.     Plaintiffs are entitled to recover damages from Defendant Robinson in an amount to be proved at trial, but in all events equal to at least $160,000, with interest thereon.

//
//
//
//
//
//
//

### THIRD CLAIM FOR RELIEF
State Securities Violation
UTAH CODE ANN. § 61-1-1, *et seq*.
*All Defendants*

71.     Plaintiffs re-allege and incorporate by reference the allegations set forth in the preceding paragraphs of this Complaint.

72.     UTAH CODE ANN. § 61-1-22 provides a private right of action for any purchaser that buys a security from a person who offers or sells securities in violation of UTAH CODE ANN. § 61-1-1(2).

73.     UTAH CODE ANN. § 61-1-1(2) makes it unlawful for any person, in connection with the sale of a security, to directly or indirectly, "make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading[.]"

74.     The investment at issue herein constitutes a "security" as that term is defined in Section 61-1-13(1)(ee) of the Utah Uniform Securities Act (the "Utah Securities Act").

75.     At the time said investment was offered, sold, and delivered to Plaintiffs, no registration statement meeting the requirements of Sections 61-1-7 through -12 of the Utah Securities Act was on file or effective with respect thereto in violation of Section 61-1-7 of the Utah Securities Act.

76.     No registration statement or prospectus containing the information required by Sections 61-1-10(2) and 61-1-10(4) of the Utah Securities Act was sent or given by any of the Defendants to Plaintiffs, in violation of Section 61-1-10(4) of the Utah Securities Act.

77.     Defendants directly or indirectly employed a device, scheme, and/or artifice to defraud Plaintiffs when they offered and sold said investment by means of untrue statements of material facts and omissions to state material facts necessary in order to make the statements

made, in the light of the circumstances under which they were made, not misleading in violation of Section 61-1-1(2) of the Utah Securities Act.

78.     As a result, Defendants have engaged in transactions, practices and a course of business that operated as a fraud and deceit upon Plaintiffs.

79.     The aforementioned actions constitute unlawful conduct in connection with the sale of a security under UTAH CODE ANN. § 61-1-1, *et seq.*

80.     As a result of the foregoing, Defendants obtained money from Plaintiffs by means of untrue statements of material fact and/or by omitting and failing to state material facts necessary in order to make the statements made in each of the circumstances under which they were made, not misleading.

81.     Plaintiffs did not know of such untruths or omissions.

82.     Defendants knew, or in the exercise of reasonable care could have and should have known, of such untruths or omissions.

83.     Upon information and belief, Defendants directly or indirectly controlled, or were partners or agents of each other (or held themselves out to be), or were persons occupying a similar status or performing similar functions.

84.     Defendants knew, or in the exercise of reasonable care could have and should have known, of the existence of the facts by reason of which liability is herein alleged to exist.

85.     Pursuant to UTAH CODE ANN. § 61-1-22(1)(a)(ii), Plaintiffs are entitled to recover their investment with Defendants, in an amount in excess of $160,000 together with interest at 12% per annum, costs and reasonable attorney's fees.

86.     Pursuant to UTAH CODE ANN. § 61-1-22(2), the conduct of Defendant Zus was reckless and/or intentional and Plaintiffs are entitled to recover, jointly and severally, three times

the amount of the consideration paid in an amount not less $480,000, together with interest, costs, and reasonable attorney's fees.

87.     Pursuant to UTAH CODE ANN. § 61-1-22(4)(a), Defendants are jointly and severally liable for breach of UTAH CODE ANN. § 61-1-1, *et seq.*

### FOURTH CLAIM FOR RELIEF
Negligent Misrepresentation
*All Defendants*

88.     Plaintiffs re-allege and incorporate by reference the allegations set forth in the preceding paragraphs of this Complaint.

89.     Alternatively, Defendants negligently made the aforementioned misrepresentations or omissions without the exercise of due care or caution in determining the truth or falsity of the representations made.

90.     Defendants directly or indirectly negligently omitted to disclose the aforementioned material facts without the exercise of due care or caution.

91.     Defendants' representations were, in fact, false, which falsity could have been determined by Defendants in the exercise of ordinary and reasonable care.

92.     Defendants made the representations for the purpose of inducing Plaintiffs to invest in the investment described above.

93.     Defendants were in a superior position to know the falsity of the representations made by them, respectively.

94.     The omissions were false when taken together with the other facts represented by Defendants to Plaintiffs, which falsity was known or should have been known by Defendants in the exercise of ordinary and reasonable care.  Defendants misrepresented and omitted to disclose the material facts for the purpose of inducing Plaintiffs to invest in said investment.

95.     In reasonable reliance upon Defendants' representations, and without knowledge of the falsity thereof and without knowledge of the material facts that Defendants omitted to disclose, Plaintiffs invested in said investment.

96.     Had Plaintiffs known of the falsity of Defendants' representations or had Defendants disclosed the material omissions, Plaintiffs would not have invested in said investment.

97.     As a direct and proximate result of the direct or indirect negligent misrepresentations made by Defendants, and the omissions of material facts, Plaintiffs have been damaged.

98.     Plaintiffs are entitled to a judgment in an amount to be proved at trial, but which shall not be less than the consideration Plaintiffs paid for the investment, no less than $160,000, together with interest thereon.

### FIFTH CLAIM FOR RELIEF
Fraudulent Inducement
*All Defendants*

99.     Plaintiffs re-allege and incorporate by reference the allegations set forth in the preceding paragraphs of this Complaint.

100.     Defendants made various representations, either directly or indirectly, to Plaintiffs of material facts regarding the investment described above.

101.     Defendants' statements were material because they affected the central purpose of the entity Ceptazyme, LLC, namely, its ability to successfully perform the License Agreement.

102.     Defendants' representations were false.

103.     Defendants knew the representations were false when they made them to Plaintiffs, or Defendants made them recklessly at the time they were made to Plaintiffs.

104.     Defendants intentionally made the false representations, either directly or indirectly, to induce Plaintiffs to act upon them by investing in said investment.

105.     Plaintiffs, acting reasonably and in ignorance of the falsity of the representations, did in fact rely and act upon them.

106.     As a result of Defendants' false misrepresentations, Plaintiffs were damaged in an amount to be determined at trial, but in any event no less than $160,000.

### SIXTH CLAIM FOR RELIEF
#### Civil Conspiracy
#### *All Defendants*

107.     Plaintiffs re-allege and incorporate by reference the allegations set forth in the preceding paragraphs of this Complaint.

108.     Defendants shared the objective of inducing Plaintiffs to invest in Defendant Ceptazyme through false and misleading statements and/or omissions.

109.     Defendants had a meeting of the minds on the object or course of action.

110.     Defendants engaged in conduct in pursuance of the scheme to deceive Plaintiffs.

111.     Plaintiffs suffered damages as a result of the concerted acts or conduct of Defendants in furtherance of the conspiracy in an amount no less than $160,000.

### SEVENTH CLAIM FOR RELIEF
#### Unjust Enrichment/Unjust Detriment
#### *All Defendants*

112.     Plaintiffs re-allege and incorporate by reference the allegations set forth in the preceding paragraphs of this Complaint.

113.     Plaintiffs conferred a benefit on Defendants when Plaintiffs invested $160,000 in Defendant Ceptazyme in November of 2010.

114.    Defendants had knowledge of the benefit and retained those benefits by accepting the funds and using them for ostensible business purposes.

115.    Under the circumstances, it would be inequitable for Defendants to retain that benefit without compensating Plaintiffs for the value provided.

116.    Defendants, and each of them, should be compelled to pay Plaintiffs the value of the unjust enrichment they have received, in an amount to be proven at trial.

*PRAYER FOR RELIEF*

**WHEREFORE**, Plaintiffs Robert McLain and Chris Maggiore pray for relief, recovery and judgment against Defendants Bradley C. Robinson and Ceptazyme, LLC, jointly, as follows:

A.    On the FIRST CLAIM FOR RELIEF for (a) an order and decree rescinding the sale of the securities to Plaintiffs and requiring the return to Plaintiffs of all funds invested with Defendants; and (b) a judgment against Defendants, jointly and severally, on Plaintiffs' federal securities violations damages in an amount to be proven at trial, but not less than $160,000, together with interest thereon;

B.    On the SECOND CLAIM FOR RELIEF for judgment against Defendants, jointly and severally, on Plaintiffs' federal securities violations damages in an amount to be proven at trial, but not less than $160,000, together with interest thereon;

C.    On the THIRD CLAIM FOR RELIEF for judgment against Defendants, jointly and severally, on Plaintiffs state securities violations damages in an amount not less than $480,000, together with interest at the rate of 12% per annum, or in the alternative, an award of damages in such amounts as are reasonable in the premises to compensate Plaintiffs for its losses caused by the conduct of the

Defendants, costs and reasonable attorney's fees incurred by Plaintiffs in this matter;

D.      On the FOURTH CLAIM FOR RELIEF for an order and decree rescinding Plaintiffs purchase of the securities and to recover the consideration paid, or, in the alternative, for a judgment against the Defendants for damages, in an amount to be proven at trial, but which shall not be less than the consideration Plaintiffs paid for the securities, together with interest thereon;

E.      On the FIFTH CLAIM FOR RELIEF for judgment against Defendants, jointly and severally, for damages, in an amount to be proven at trial, but which shall not be less than $160,000;

F.      On the SIXTH CLAIM FOR RELIEF for judgment against Defendants, jointly and severally, for damages, in an amount to be proven at trial, but which shall not be less than $160,000;

G.      On the EIGHTH CLAIM FOR RELIEF for judgment against Defendants, jointly and severally, for damages, in an amount to be proven at trial, but which shall not be less than the consideration Plaintiffs paid for the securities, together with interest thereon;

H.      On all claims for relief, Defendants' acts described above were willful and malicious or were intentionally fraudulent or manifested a knowing and reckless indifference toward, and a disregard of, Plaintiffs' rights.  Under applicable law, including UTAH CODE ANN. § 78B-8-201, Plaintiffs are entitled to a judgment for exemplary and punitive damages in an amount to be proved at trial on the

applicable claims but which shall be up to three times the amount of compensatory and general damages awarded at trial.

I.      Pre-judgment and post judgment interest, actual costs incurred, attorneys' fees, and reasonable expert witness fees and such additional relief as the Court deems fair and just.

*JURY DEMAND*

Plaintiffs hereby demand a trial by jury and submit the fee herewith.

DATED this 20th day of May, 2013.

CHRISTENSEN & JENSEN, P.C.

/s/ Sarah E. Spencer
Dale J. Lambert
Sarah Elizabeth Spencer
*Attorneys for Plaintiffs*

Plaintiffs' Address:

Contact through counsel
CHRISTENSEN & JENSEN, P.C.
15 W. South Temple, Suite 800
Salt Lake City, Utah 84101